IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-342

No. COA21-513

Filed 17 May 2022

Nash County, No. 20 SP 147

BOTTOMS TOWING & RECOVERY, LLC, Petitioner,

v.

CIRCLE OF SEVEN, LLC, Respondent.

Appeal by respondent from order and judgment entered 26 February 2021 by Judge Quentin T. Sumner in Nash County Superior Court. Heard in the Court of Appeals 23 March 2022.

*Fields & Cooper, PLLC, by John S. Williford, Jr., and Ryan S. King, for petitioner-appellee.*

*Q. Byrd Law, by Quintin D. Byrd, for respondent-appellant.*

ARROWOOD, Judge.

¶ 1        Circle of Seven, LLC ("respondent") appeals from the trial court's order and judgment regarding Bottoms Towing & Recovery, LLC's ("petitioner") Petition for Authorization to Sell Motor Vehicle Under a Lien. Respondent contends the trial court erred in affirming the lien and authorizing the sale of a truck, and that the claimed lien amount exceeded legal limits. For the following reasons, we affirm the

- 1 -

trial court.

## I.  Background

¶ 2        On 17 November 2020, petitioner filed a Petition for Authorization to Sell Motor Vehicle Under a Lien in Nash County Superior Court.  The vehicle at issue was a 2018 Dodge Ram truck ("Truck"), owned by and registered to respondent.  The Clerk of Court entered an order the same day authorizing petitioner to sell the Truck, with a sale scheduled for 14 December 2020.

¶ 3        On 9 December 2020, respondent filed a Notice of Contested Sale and Lien with the Clerk seeking an order staying the sale and transferring the proceedings to the Superior Court Division for a hearing.  The Clerk of Court entered an order the same day granting respondent's request.

¶ 4        The matter was heard in Nash County Superior Court on 1-2 February 2021, Judge Sumner presiding.  The evidence and testimony presented at the special proceeding tended to show as follows.

¶ 5        In 2014, Sainte Deon Robinson, Sr. ("Robinson"), designated himself as sole managing member for two limited liability companies:  respondent, and One BlueSky Investments, LLC ("BlueSky").  In 2016, BlueSky purchased property at the address 973 Wesleyan Boulevard, Rocky Mount, North Carolina ("Wesleyan property") in a seller-financed transaction from Anne D. Cliett ("Cliett").

¶ 6        On 2 May 2018, Robinson was indicted on federal charges for failure to collect

and pay over trust fund taxes. On 4 October 2018, Robinson reached a plea agreement, with a memorandum of the agreement filed 5 October 2018. On 22 March 2019, the United States District Court for the Eastern District of North Carolina entered judgment against Robinson based on his guilty plea, and sentenced Robinson to thirty months imprisonment.

¶ 7        Shortly after Robinson was indicted, Cliett and her company, Cliett, Inc., initiated judicial foreclosure proceedings in Nash County Superior Court against BlueSky on the Wesleyan property. On 11 February 2019, the trial court entered a judgment and order of sale, appointing a commissioner to sell the Wesleyan property at a judicial sale. The sale was noticed and held on 20 March 2019, with Cliett and Cliett, Inc. as the highest bidders at the sale. BlueSky filed for Chapter 11 bankruptcy on 1 April 2019, which stayed the sale.

¶ 8        Respondent operated out of the Wesleyan property and Robinson stored the Truck and other personal property there, including a second truck which is not at issue in this case. Robinson testified that in anticipation of his imprisonment, he replaced the tires on the Truck on 24 January 2019. Robinson also testified that Eulanda Elliott ("Elliott") was "[a]bsolutely" authorized to conduct business on behalf of respondent. Elliott was not listed as a registered agent or manager for respondent on respondent's Secretary of State documents.

¶ 9        Robinson testified that the mileage on the Truck on 24 January 2019 was

81,004 miles. Robinson also testified that he had additional maintenance work done on the Truck; a copy of the invoice for the work was admitted into evidence, which indicated a mileage of 81,007. Robinson then stored the Truck at the Wesleyan property, left a key in the ignition, placed another key in a secure location, and locked the Wesleyan property. Robinson testified that he went to prison on 10 September 2019.

¶ 10        On 19 November 2019, Cliett filed a notice of default and subsequently notified the trial court of the bankruptcy court's order and default, seeking to confirm the prior sale. On 5 December 2019, the trial court entered an order confirming the foreclosure sale and directing the sale distributions; a general warranty deed was filed reflecting Cliett's interest in the Wesleyan property.

¶ 11        Elliott testified that at some point after the foreclosure sale was confirmed, she contacted Dan Howell ("Howell"), who managed Cliett's affairs, to make arrangements to retrieve respondent's personal property, including the Truck, from the Wesleyan property. Howell directed Elliott to contact his attorney, John S. Williford ("Williford"), who also represents petitioner in this case. Elliott called Williford four times: once each on 27 and 30 January 2020, and twice on 31 January 2020. Elliott testified that she made arrangements to retrieve respondent's property on 28 February 2020, including the rental of a U-Haul truck.

¶ 12        When Elliott arrived at the Wesleyan property on 28 February, she spoke with

Howell and another individual who identified himself as a representative of petitioner and gave Elliott a business card for petitioner. Elliott testified that she was told that petitioner would be "[r]emoving the property" from the Wesleyan property; petitioner's representative did not specifically tell Elliott that petitioner would be towing the trucks. Elliott further testified that she did not pick up the trucks on 28 February because she did not have the keys and did not know where they were located.

¶ 13 Elliott contacted Howell again "a couple of weeks" after first attempting to retrieve the trucks.[1] Howell informed Elliott that petitioner had towed the trucks. Elliott subsequently called petitioner at the number on the business card and spoke to Glenn Bottoms ("Bottoms") in order to "find out what [she] needed to do to come pick up the [Truck]."

¶ 14 Elliott testified that she spoke to Bottoms several times and was given several different reasons as to why the Truck could not be retrieved. Bottoms first directed Elliott to speak with Howell again, and later "stated that he needed to hear back from the DMV before he could release the [Truck]." Elliott stated that she produced a letter from the North Carolina Department of Transportation notifying respondent that the Truck was in petitioner's possession, but Bottoms responded that he "ha[d]

---

[1] A cell phone bill admitted into evidence indicated that Elliott contacted Howell on 27 March 2020.

to wait to hear back from the bank" before releasing the Truck.[2]  When Elliott called Bottoms again on 17 April 2020 to confirm that respondent "was the registered owner of the [Truck,]" Bottoms stated that the bank instructed him not to release the Truck because the bank was coming to pick up both trucks.  Elliott testified that Bottoms did not tell her during these conversations how much the tow and storage would cost.

¶ 15        On cross-examination, Elliott acknowledged that she was "not legally" the manager of respondent and did not provide Bottoms with any documentation that she was an authorized agent or representative for respondent.  Elliott also acknowledged that approximately three months had elapsed between the foreclosure sale and when the Truck was towed.  Elliott stated that she "inadvertently forgot to get the keys" to remove the Truck on 28 February but that she did remove other personal property, only leaving the two trucks, a commercial-style lawnmower, and "trash items[.]"

¶ 16        Bottoms testified that on 5 March 2020, he had a conversation with Cliett and subsequently went to the Wesleyan property and "loaded two trucks up and carried them to [petitioner's] lot."  Bottoms provided Cliett with a bill for towing and storing the Truck, charging $150.00 for the tow and $40.00 daily for storage.  Bottoms "let them sit there for about ten days, and then" filed a Report of Unclaimed Motor Vehicles on 13 March 2020.  On 6 April 2020, the Department of Transportation sent

---

[2] Elliott stated that this conversation was by telephone on 9 April 2020.

letters providing notice of the report to petitioner, respondent, and Cliett. On 24 April 2020, petitioner filed a "Notice of Intent to Sell a Vehicle to Satisfy Storage and/or Mechanic's Lien" for the Truck, listing Cliett as the person authorizing towing and storage.

¶ 17 Bottoms stated that when he towed the Truck, he searched for keys "in the glove box, over the top of the sunvisor, and in the ashtray[,]" but failed to find any keys. On 15 October 2020, Bottoms had a locksmith make a new set of keys for the Truck. Bottoms testified that between 5 March 2020 and 15 October 2020, it was not possible to drive the Truck.

¶ 18 Regarding expenses, Bottoms testified that he had two batteries, two fuel filters, an oil filter, a right front tire, and chrome wheel covers installed for the Truck. An invoice admitted into evidence reflected a total cost of $1,351.41 for parts and $12,040.00 for storage; the total claimed balance due amounted to $14,048.65. Bottoms testified that after getting the Truck serviced and re-keyed, he "drove it home five or six times, . . . just to make sure everything was running good [sic]." Bottoms estimated that he put "between two and two hundred fifty miles" on the Truck. When asked about respondent's claim that the Truck was driven an additional ten thousand miles, Bottoms responded, "Impossible." Bottoms later stated that he had "no idea" what the mileage on the Truck was when he towed it, but that it had "about 90,000 miles on it" at the time of the hearing.

¶ 19        On 10 September 2020, the Department of Transportation sent a letter to respondent indicating that petitioner claimed a lien in the amount of $2,230.00 on the Truck and that respondent had the right to a judicial hearing regarding the claimed lien. On 10 October 2020, the Department of Transportation sent a letter to petitioner stating it had been unable to secure delivery of certified mail to respondent, and that if petitioner wished to sell the vehicle to satisfy the claimed lien, "[petitioner] may have a judicial hearing before a court of competent jurisdiction to determine its validity" or file a petition with the Clerk of Court.

¶ 20        Robinson was released from prison on 13 October 2020. Robinson testified that on 6 November 2020, he called Bottoms to ask why the Truck was in petitioner's possession, and Bottoms replied, "Well, if you want your truck, you can get it, but you've got to bring some proof from the bank." On 10 November 2020, Robinson drove to petitioner's address and saw the Truck, which he did not initially recognize because the rims were replaced, some decals were removed, and the Truck was repainted white. Robinson also observed damage to the Truck's bumper and passenger side rear fender. Bottoms later confirmed that it was the Truck. Robinson testified that Bottoms also told him that he owed petitioner "ten-thousand-something dollars . . . ."

¶ 21        After the presentation of evidence concluded, petitioner argued that there was no obligation to communicate with Elliott because no one from respondent "produce[d] any documents that obligated Bottoms to deal with [Elliott.]" Petitioner

additionally argued that it had a valid claim because Cliett was the legal possessor of the Truck at the time it was towed. Respondent, on the other hand, contended that there was insufficient evidence that petitioner had followed proper procedures as set out in several statutes in towing the Truck. Respondent further contended that the communications between Elliott and Bottoms did not comport with petitioner's agency argument, and concluded by arguing that any lien should be limited to the period of 6 March 2020, when petitioner began storing the Truck, to 27 March 2020, when Elliott claimed she began attempting to recover the Truck from petitioner.

¶ 22     At the conclusion of the hearing, the trial court found that there was a valid lien by petitioner and an express contract between petitioner and Cliett for the towing and storage of the Truck. The trial court reduced the lien amount due to unnecessary maintenance and alterations. The trial court found that respondent owed petitioner a total of $13,620.00, further reduced by $62.50 due to Bottoms's admission that he drove the Truck "250 miles during the time that he had the vehicle stored." On 26 February 2021, the trial court entered an order and judgment affirming the lien and authorizing the sale of the Truck, and requiring respondent to post a cash bond of $13,557.50 as a condition of any stay pending an appeal.

¶ 23     On 17 March 2021, respondent filed and served notice of appeal.

## II.     Discussion

¶ 24     Respondent contends the trial court erred in affirming the lien and authorizing

the sale of the truck and that the claimed lien amount exceeded legal limits. We disagree.

### A.    Standard of Review

"The standard of appellate review for a decision rendered in a non-jury trial is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." *Sessler v. Marsh*, 144 N.C. App. 623, 628, 551 S.E.2d 160, 163 (citation omitted), *disc. review denied*, 354 N.C. 365, 556 S.E.2d 577 (2001). "Findings of fact are binding on appeal if there is competent evidence to support them, even if there is evidence to the contrary." *Id.* (citation omitted). "The trial court's conclusions of law drawn from the findings of fact are reviewable *de novo*." *Curran v. Barefoot*, 183 N.C. App. 331, 335, 645 S.E.2d 187, 190 (2007) (citing *Humphries v. City of Jacksonville,* 300 N.C. 186, 187, 265 S.E.2d 189, 190 (1980)).

### B.    Affirming Lien and Authorizing Sale

Respondent's argument centers on the contention that petitioner did not have an express or implied contract with the legal possessor of the Truck because Cliett was not the legal possessor. We disagree.

Under Chapter 44A, "legal possessor" is defined as meaning "[a]ny person entrusted with possession of personal property by an owner thereof, or . . . [a]ny person in possession of personal property and entitled thereto by operation of law."

N.C. Gen. Stat. § 44A-1(1) (2021). N.C. Gen. Stat. § 44A-2(d) governs liens for motor

vehicles:

> Any person who repairs, services, tows, or stores motor vehicles in the ordinary course of the person's business pursuant to an express or implied contract with an owner or legal possessor of the motor vehicle, except for a motor vehicle seized pursuant to G.S. 20-28.3, has a lien upon the motor vehicle for reasonable charges for such repairs, servicing, towing, storing, or for the rental of one or more substitute vehicles provided during the repair, servicing, or storage. This lien shall have priority over perfected and unperfected security interests. Payment for towing and storing a motor vehicle seized pursuant to G.S. 20-28.3 shall be as provided for in G.S. 20-28.2 through G.S. 20-28.5.

N.C. Gen. Stat. § 44A-2(d).

¶ 28        In *Green Tree Financial Servicing Corp. v. Young*, this Court reviewed several

cases involving a motor vehicle lien under N.C. Gen. Stat. § 44A-2(d), in which our

appellate courts had "held that a storage or towing company may obtain a lien over a

motor vehicle . . . when the company is directed by a sheriff to tow or store that

vehicle." *Green Tree Fin. Servicing Corp. v. Young*, 133 N.C. App. 339, 342, 515

S.E.2d 223, 225 (1999) (citations omitted). "These holdings . . . involve an implied

contract with a legal possessor, i.e., the sheriff, to tow and store a vehicle in a

situation whereby the legal possessor has no intention of paying the requisite towing

and storage costs." *Id.* The motor vehicle at issue in *Green Tree* was an abandoned

mobile home that was towed at the request of the legal possessor after a Judgment of

Summary Ejectment and writ of possession; the Court noted that the towing company "did not expect . . . the legal possessor[ ] to pay for the mobile home's towing and storing, but rather expected that the mobile home's owner would pay those fees." *Id.* The Court affirmed the towing and storage lien. *Id.*

¶ 29       In the order *sub judice*, the trial court found that petitioner "repairs, services, tows, or stores motor vehicles in the ordinary course of its business[,]" and that petitioner "entered into an express contract on March 5, 2020 with [Cliett] for [p]etitioner to tow the Truck . . . for $150.00 and to store the Truck at the rate of $40.00 per day." The trial court further found "[Cliett] was then the owner of this real property where the Truck had been left, and she was legal possessor of the Truck." Based on these findings, the trial court concluded that petitioner "entered into an express contract on March 5, 2020 with [Cliett], the legal possessor of the Truck, for [p]etitioner to tow the Truck from [the Wesleyan property], where the Truck had been left unattended," for the aforementioned towing and storage rates.

¶ 30       The trial court's findings were supported by competent evidence and in turn support its conclusions of law. Respondent does not dispute that petitioner tows and stores motor vehicles in the ordinary course of its business, that the Wesleyan property was purchased by Cliett at a foreclosure sale, or that the Truck was left there. These facts were established by ample testamentary and documentary evidence. At the time petitioner entered a contract with Cliett to tow and store the

Truck, Cliett was the legal possessor of the Wesleyan property, and by operation of law was the legal possessor of the Truck.

¶ 31    We note that the foreclosure proceedings were initiated in February 2019, and although the sale was stayed by BlueSky's bankruptcy in April 2019, Robinson did not go to prison until September 2019 and had the opportunity to move the Truck to a different location but failed to do so. Additionally, although Robinson, the only authorized agent of respondent, was unable to take direct action to reclaim the Truck during his imprisonment, he had some ability, both prior to and during his imprisonment, to legally authorize another individual, such as Elliott, to act on respondent's behalf. Robinson, however, failed to do so.

¶ 32    Although respondent argues that the trial court was required to specifically find or conclude "that Bottoms entrusted [Cliett] with possession or that she was entitled to possession by operation of law[,]" respondent has failed to identify any precedent to support this argument. Despite respondent's arguments to the contrary, we find this case to be analogous to *Green Tree* and the cases cited therein. The foreclosure sale was similar to the writ of possession in *Green Tree*, and although petitioner may not have expected Cliett to pay for the towing and storage fees, our caselaw is clear that this expectation is irrelevant to a lien claim. As this Court held in *Green Tree*, "[w]e see no reason to depart from the reasoning of these cases." *Id.* The trial court's finding that Cliett was the owner of the Wesleyan property, where

the Truck had been left, was sufficient to establish that she was the legal possessor for statutory purposes.

¶ 33    Alternatively, respondent argues that petitioner did not have a contract with the owner or legal possessor of the Truck, reiterating the argument that Cliett was not the legal possessor.  Respondent notes that the invoice and receipts establishing the contract identified "Bottoms Tire" or "Bottoms Tire & Auto," but not petitioner. While the invoice description does state that the Truck was "towed to Bottoms Tire for storage[,]" the invoice heading identifies "Bottoms Towing & Recovery Inc."[3]  The trial court received competent evidence to support its finding that a contract existed between petitioner and Cliett for the towing and storage of the Truck, and respondent's arguments to the contrary are without merit.

¶ 34    Respondent next contends that petitioner had no enforceable possessory lien on the Truck because there was insufficient evidence that petitioner satisfied N.C. Gen. Stat. § 44A-4(a), which provides that a lien may be enforced for towing and storage charges on a motor vehicle if the charges "remain unpaid or unsatisfied for . . . 10 days following the maturity of the obligation to pay any such charges[.]" N.C. Gen. Stat. § 44A-4(a) (2021).  Respondent argues that petitioner "never communicated or attempted to communicate the amount of the alleged obligation

---

[3] Petitioner's legal name on its Articles of Organization, and as stated on the Petition, is "Bottoms Towing & Recovery, LLC."

until November 2020, after amassing months of storage fees and *after* it had already claimed a lien[,]" which "prevents a determination that the lien remained unpaid." Petitioner, however, argues that respondent never disclosed that Elliott was an agent with authority to act on respondent's behalf.

¶ 35        Although Elliott testified that she made numerous attempts to retrieve the Truck from petitioner, she also acknowledged on cross-examination that she did not have any actual legal authority to act on respondent's behalf. Additionally, while Elliott testified that Bottoms gave several different reasons why she could not take the Truck without questioning her authority as an agent, Bottoms testified that he had only spoken to Elliott at his garage, and that "[s]he never presented any paperwork at all." This constitutes competent evidence that respondent did not present an authorized agent until November 2020, when Robinson first contacted petitioner. Bottoms was not obligated to communicate the amount of the obligation to Elliott, and his failure to do so has no bearing on the trial court's conclusion of law regarding N.C. Gen. Stat. § 44A-4(a).

## C.        Lien Legal Limits

¶ 36        Respondent further argues the amount of the lien should be limited "to only include days prior to [Elliott]'s first attempt to retrieve the Truck," and should be substantially reduced by Bottoms's personal use of the Truck. In support of this argument, respondent again notes that Bottoms instructed Elliott "to provide bank

and repossession paperwork as if she were authorized to retrieve the Truck."

¶ 37        With respect to storage expenses, the trial court found that the Truck was stored by petitioner from 5 March 2020 to 1 February 2021 when the special proceeding was heard. This finding was supported by Bottoms's testimony regarding the towing and storage of the Truck. As previously discussed, Elliott did not have legal authority to act on behalf of respondent, and despite her testimony regarding her attempts to communicate with Bottoms, respondent did not take any action that serves to limit or negate the duration of petitioner's storage of the Truck. The contract established a storage rate of $40.00 per day, and the trial court's finding that petitioner stored the Truck for 333 days was supported by competent evidence. Accordingly, the trial court's findings with respect to the duration and amount of the lien were supported by competent evidence, and in turn support the conclusions of law.

¶ 38        Finally, respondent argues the lien should be limited by Bottoms's personal use of the Truck, noting that Bottoms drove the Truck, kept personal items inside, made alterations, and that the Truck's mileage increased by approximately ten thousand miles during the storage period. Petitioner, however, notes Bottoms's testimony that he did not have a key to the Truck until 15 October 2020 and that he drove around 250 miles after obtaining the key.

¶ 39        The trial court found that Bottoms drove the Truck 250 miles and reduced the

lien at a rate of $0.25 per mile, additionally reducing the claimed lien amount for the alterations and maintenance it deemed unnecessary. Because these findings are supported by Bottoms's testimony and documentary evidence that was judicially noticed by the trial court, they are binding on appeal and support the related conclusions of law, even though there was evidence to the contrary. Neither the claimed lien amount nor the trial court's order exceeded legal limits.

## III. Conclusion

¶ 40 For the foregoing reasons, we affirm the trial court's order and judgment.

AFFIRMED.

Judge CARPENTER concurs.

Judge TYSON concurs in the result in part and dissents in part by separate opinion.

TYSON, Judge, concurring in the result in part and dissenting in part.

¶ 41		The majority's opinion properly affirms the trial court's conclusion that petitioner possesses a valid statutory lien. The trial court erred in its calculation of the offset to reduce the lien amount due to Bottoms' unlawful conversion and personal use of the stored Truck. The order and judgment authorizing the sale of the Truck should be reversed and remanded for re-calculation of offset and credits based upon this error. I concur in the result in part and respectfully dissent in part.

## I.   Conclusion of Law

### A. Standard of Review

¶ 42		The trial court found, solely on Bottoms' self-serving and unsubstantiated testimony, that he had driven the Truck 250 miles for personal use and reduced the lien for that mileage at an unexplained rate of $0.25 per mile. This calculation of the offset due against the lien is more properly designated and reviewed as a conclusion of law.

¶ 43		"As a general rule, however, any determination requiring the exercise of judgment, or the application of legal principles, is more properly classified a conclusion of law. Any determination reached through logical reasoning from the evidentiary facts is more properly classified a finding of fact." *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (internal citations and quotation marks

omitted).

¶ 44        The calculation and award of the amount offset due to the owner against the lien is a conclusion of law. This conclusion is subject to *de novo* review on appeal.

### B. Valuation

### *1.        Conversion*

¶ 45        The Truck at issue was secured in a locked facility in 2019, prior to Robinson reporting to prison. After the Truck was removed from where Robinson had secured it, the prior documented mileage at that time increased by approximately 10,000 miles. Bottoms' testified and admitted he took possession of the vehicle and drove the truck about "250 miles during the time that he had the vehicle stored." Bottoms' self-serving admission of using the truck for about 250 miles is not supported by any other competent evidence and is directly contradicted by documented objective evidence.

¶ 46        Bottoms' taking possession under the statutory lien does not allow for any personal use of Robinson's Truck. Bottoms did not come into possession of the vehicle through any express or implied agreement with the vehicle's registered owner.

¶ 47        Robinson had sent someone to pay the towing and storage fees, which could be used to offset any amount accrued, and which Bottoms refused to accept payment. This fact should be considered of his intent, along with his admitted act of conversion and personal use during the statutory possession of the vehicle. Our General

Statutes should provide a statutory remedy and offset for Robinson for Bottoms' admitted conversion of his Truck. Petitioner charged Robinson storage fees during the time he admitted he was driving the Truck for personal use, and not keeping the Truck in the condition when taken while in storage. The decision on the validity of Bottoms' lien does not foreclose Robinson's ability to receive credit for Bottoms' unlawful conversion and use.

### *2.     Valuation of Offset*

¶ 48      The trial court reduced the lien amount by only $0.25 for each mile Bottoms claimed he had used the vehicle for personal use. The trial court assessed a wholly unsupported and arbitrary cost-per-mile calculation to compute this offset value against the lien.

¶ 49      North Carolina courts have applied diminished market value as a measure of damages for conversion and physical harm to property. *See Phillips v. Chesson*, 231 N.C. 566, 571, 58 S.E.2d 343, 347 (1950) ("[T]he measure of damages recoverable for injury to property is the difference between the market value immediately before the injury and the market value immediately afterwards.").

### II.     Conclusion

¶ 50      The trial court should have assessed an offset of the loss in value to equal Bottoms' conversion and the added miles to reduce the Truck's book value. This method should also include any other damages to the Truck after Bottoms took

*TYSON, J., concurring in the result in part and dissenting in part*

possession and during the period of conversion and unauthorized use.

¶ 51        I concur with the majority's result holding the petitioner acquired and possesses a valid statutory lien.  The trial court erred in its calculation and conclusion of the amount to offset and the credit due against the lien on account of petitioner's unlawful conversion and personal use of the stored Truck.  I respectfully dissent.